Filed 6/12/25 (review denied 10/15/25; reposted with Supreme Court order and statement)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>　　v.<br><br>BRANDON DUANE WAGSTAFF,<br><br>　　Defendant and Appellant. | H050597<br>(Santa Clara County<br>Super. Ct. No. C1919118) |

A jury found defendant Brandon Duane Wagstaff guilty of felony false imprisonment and related offenses arising out of a domestic violence incident. The trial court imposed a term of 16 months in prison.

Wagstaff, a Black man, contends the trial court violated the California Racial Justice Act of 2020 (Racial Justice Act, or RJA) on multiple occasions during different stages of the proceedings. Because trial counsel did not object to any of these statements under the RJA, we hold Wagstaff's claims were forfeited on appeal. As to one statement the trial court made at Wagstaff's sentencing hearing, he contends trial counsel rendered ineffective assistance by failing to object. We conclude this claim is without merit because Wagstaff has not shown his trial counsel's conduct constituted deficient performance.

Wagstaff further contends the trial court erred by failing to instruct the jury sua sponte on misdemeanor false imprisonment as a lesser included offense of felony false imprisonment. We conclude this claim is without merit because substantial evidence did not support an instruction on misdemeanor false imprisonment.

Accordingly, we affirm the judgment.

# I. FACTUAL AND PROCEDURAL BACKGROUND

## A. Procedural Background

The prosecution charged Wagstaff with five counts:  count 1—felony false imprisonment by violence, menace, fraud, and deceit (Pen. Code, § 236)[1]; count 2—attempted second degree robbery (§§ 212.5, subd. (c), 664); count 3—contempt of court for violating a protective order (§ 166, subd. (c)(1)); count 4—threatening to commit a crime resulting in death or great bodily injury (§ 422, subd. (a)); and count 5—battery upon a person in a dating relationship (§ 243, subd. (e)(1)).  The prosecution further alleged Wagstaff had suffered a prior conviction for a violent or serious felony.  (§§ 667, subd. (a)(1), 1170.12, subd. (b)(1).)

Before trial began in this case, the prosecution charged Wagstaff in case No. C2011896 for conduct unrelated to the offenses charged in this case.  In 2021, Wagstaff was convicted by plea in case No. C2011896 for a term of eight years.

Jury selection in this case began in January 2022, and the jury rendered verdicts in February 2022.  The jury found Wagstaff guilty on counts 1, 3, 4, and 5 as charged, but not guilty on count 2.  Wagstaff admitted the prior conviction allegations.

The trial court sentenced Wagstaff in November 2022 and imposed an aggregate term of nine years four months including the eight-year term for case No. C2011896.  In this case, the court imposed a consecutive 16-month term on count 1, equal to one-third of the doubled two-year midterm.  The court struck the five-year prior conviction enhancement and stayed the remaining terms under section 654.

## B. Facts of the Offenses

In August 2019, Brandon Wagstaff was driving his BMW on Monterey Road in San Jose with his girlfriend Jane Doe in the front passenger's seat.  Rebecca Alvarez was

---

[1] Subsequent undesignated statutory references are to the Penal Code.

driving nearby, and Rebecca Fowler was standing on the side of the road with an unidentified male friend.

Alvarez saw that the front passenger side door of the BMW was open and someone's foot was sticking out. Alvarez heard Fowler screaming from the side of the road, directing Alvarez's attention to the BMW. The open door of the BMW hit a sign while the car was moving. The BMW made a right turn onto San Jose Avenue and came to a brief stop, whereupon Doe got out of the BMW, and the BMW drove away. Alvarez attempted to follow it, but the BMW was going too fast and the traffic was too congested, so Alvarez gave up and returned to the corner of Monterey Road and San Jose Avenue where Doe had exited the vehicle.

Fowler called 911 from that location while Doe, Alvarez, and Fowler's friend waited nearby. Fowler told the 911 dispatcher, "I saw a car come just racing around the corner, and this girl was trying to kick the door open and jump out." The dispatcher asked to speak with Doe, and Doe identified Wagstaff as the driver of the BMW. Doe told the dispatcher, "[H]e started hitting me 'cause he uh, he thought I took his money when I didn't. He started hitting me, and every time I tried to open the door to get out, he would hit me. And then more he'd tell me, if you open that door, I'll hit you."

Police arrived at the location and took statements from Doe, Alvarez, Fowler, and Fowler's male friend. None of these witnesses testified at trial, but portions of their statements were recorded on police officers' body cameras, and the videos were introduced into evidence together with officers' testimony about the statements.

Fowler told an officer she had seen legs hanging out of the passenger side of the car, and she heard a male screaming, "Shut the door. Shut the door." Alvarez told an officer she had seen the male in the car holding on to Doe. Fowler's male friend said it looked like they were fighting.

Doe told the police that she and Wagstaff were driving on the street when they got into an argument about some money she was holding, and Wagstaff reached over to grab

3

it.  Wagstaff started hitting Doe in the face, and she tried to get out of the car, but he would not let her out, so she started "screaming at the top of her lungs."  Wagstaff told her to stop screaming or he would "give her something to scream about."  Doe stated that she was trying to pull away from Wagstaff, but he kept trying to hit her and take the money.  She tried to open the car door, telling him, "Let me out, let me out."  Wagstaff used one hand to try to hold the door closed, and Doe put her foot out the door, trying to keep it open.  Doe told police Wagstaff struck her in the face four times with a closed fist during the incident.  She complained of pain around her mouth and the left side of her face, and an officer observed swelling.  The video of her statement to the police shows her holding a cold compress to her face.

Doe told the police there was a history of domestic violence between herself and Wagstaff.  At one point, Wagstaff told Doe, "I could kill you if I wanted to."  She was afraid of him, and she feared he would retaliate against her.  Doe requested an emergency protective order because she was in fear for her safety.

The day after the incident, Doe contacted the police and recanted the statements she had made to the police the previous day.  At the preliminary hearing, she testified that she made up the statements because she was mad at Wagstaff for cheating on her.  She denied that he had hit her in the face.  She testified that she opened the car door and threatened to jump out because she wanted to get a reaction from him.  Doe testified that Wagstaff pulled over and let her out of the car as soon as it appeared safe to do so, and she was not prevented from leaving the car.  Doe was shown a photograph of her face taken on the day of the incident that showed her top lip was swollen, but she testified that it was an injury from a fight she had with another person the night before the incident.

A redacted transcript including this testimony was introduced into evidence.  Doe refused to testify at trial.

4

## II. DISCUSSION

### A. *Claims Under the Racial Justice Act*

Wagstaff contends the trial court violated the RJA during jury selection and at the sentencing hearing, rendering his conviction and sentence invalid. The Attorney General concedes the trial court made a statement that violated the RJA at sentencing, such that the sentence must be vacated and the matter remanded for resentencing before a different judge. However, the Attorney General disputes all other asserted violations of the RJA and he contends Wagstaff's conviction is valid.

### 1. *Legal Principles*

The Legislature enacted the Racial Justice Act through the passage of Assembly Bill No. 2542 (2019-2020 Reg. Sess.). "The Legislature passed the RJA in 2020 with a stated aim 'to eliminate racial bias from California's criminal justice system' and 'to ensure that race plays no role at all in seeking or obtaining convictions or in sentencing.' (Stats. 2020, ch. 317, § 2, subd. (i).) To that end, the RJA prohibits the state from seeking or obtaining a criminal conviction, or seeking, obtaining, or imposing a sentence, on the basis of race, ethnicity, or national origin. [Citation.]" (*People v. Wilson* (2024) 16 Cal.5th 844, 945-946.)

The RJA added section 745 to the Penal Code effective January 1, 2021. (Stats. 2020, ch. 317, § 3.5.) Section 745, subdivision (a) (section 745(a)) sets forth four categories of conduct which, if proven by a preponderance of the evidence, establish a violation. (§ 745, subds. (a)(1)-(a)(4).) A violation of subdivision (a)(1) has occurred if "[t]he judge, an attorney in the case, a law enforcement officer involved in the case, an expert witness, or juror exhibited bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin." (§ 745, subd. (a)(1).)

Section 745, subdivision (a)(2) provides, in relevant part, that a violation has occurred if "[d]uring the defendant's trial, in court and during the proceedings, the judge, an attorney in the case, a law enforcement officer involved in the case, an expert witness,

5

or juror, used racially discriminatory language about the defendant's race, ethnicity, or national origin, or otherwise exhibited bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin, whether or not purposeful." (§ 745, subd. (a)(2).) Subdivision (h)(4) further defines "[r]acially discriminatory language" to mean "language that, to an objective observer, explicitly or implicitly appeals to racial bias, including, but not limited to, racially charged or racially coded language, language that compares the defendant to an animal, or language that references the defendant's physical appearance, culture, ethnicity, or national origin." (§ 745, subd. (h)(4).)

For claims based on the trial record, a defendant may raise a claim alleging a violation of section 745(a) on direct appeal from the conviction or sentence. (§ 745, subd. (b).) If a court finds a violation of section 745(a), subdivision (e) mandates specific remedies. As relevant here, if a court finds, after judgment has been entered, "that a conviction was sought or obtained in violation of subdivision (a), the court shall vacate the conviction and sentence, find that it is legally invalid, and order new proceedings consistent with subdivision (a)." (§ 745, subd. (e)(2)(A).) However, "if the court finds that only the sentence was sought, obtained, or imposed in violation of subdivision (a), the court shall vacate the sentence, find that it is legally invalid, and impose a new sentence. On resentencing, the court shall not impose a new sentence greater than that previously imposed." (§ 745, subd. (e)(2)(B).)

### 2. *The Trial Court's Statements at the Sentencing Hearing*

Wagstaff contends the trial court violated the RJA by using racially discriminatory language about his race and exhibiting bias against him in violation of section 745(a). Specifically, Wagstaff points to the trial court's use of the phrase "strong young buck" when the court personally addressed Wagstaff about the nature of his conduct. Additionally, Wagstaff argues the court's use of the term "boy" and admonitions to Wagstaff to "become a man" and make "manly decisions" constituted demeaning and racially discriminatory language. Wagstaff contends that if trial counsel's failure to

6

object constitutes forfeiture of the claim on appeal, then trial counsel rendered ineffective assistance. Wagstaff argues we must vacate his conviction and sentence, find that it is legally invalid, and order new proceedings consistent with section 745(a). He contends in the alternative that we must vacate his sentence and remand for resentencing.

The Attorney General concedes the trial court's use of the phrase "strong young buck" constituted a violation of section 745(a), but he contends the violation only requires that we vacate the sentence and remand for resentencing before a different judge. For the reasons below, we decline to accept the Attorney General's concession.

### a. Procedural Background of the Sentencing Hearing

Prior to sentencing, Wagstaff moved under section 1385 and *Romero*[2] to dismiss the prior strike conviction and the five-year enhancement for it. Among other grounds, Wagstaff pointed out he was only 19 years old when he committed the prior strike offense, and only 22 years old when he committed the offenses charged in counts 1, 4, and 5 of this case. Wagstaff also moved to reduce the conviction on count 4 (criminal threats) to a misdemeanor under section 17, subdivision (b).

In denying Wagstaff's motions, the court addressed him personally and stated, among other things, "You are a young man, but *you're not a boy*, you're not an adolescent. This motion and this idea about adolescent child behavior has merit, but I don't know that it has application in your case. [¶] People are influenced by many things. There are a lot of young men of color, there are African-American men, there are Asian men, there are Hispanic men, there are white kids and children who are tremendously and disproportionately impacted by poverty, by drugs, by violence, by other things in life that they have no control over, and you're no different; but a lot of those kids stand up, buckle down, and meet these challenges without resorting to crime." (Italics added.)

---

[2] *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497.

7

The trial court acknowledged the absence of Wagstaff's father in his life but pointed out that Wagstaff had other family members to give him support, adding, "[T]he question is, 'Do you want to do the right thing?' You know, you have to *become a man*. And I don't mean to disrespect you, but you have to make *manly* decisions, hard decisions to take control of your life. [¶] You know, it's easy to bust into people's homes and take property because they're not there or because *you're a strong young buck* and you can do these things at-will. That's weak. There's nothing *manly*, there's nothing right about that, and your mom will tell you that." (Italics added.)

Wagstaff's trial counsel did not object to any of these statements.

### b. *Forfeiture*

We first consider whether trial counsel's failure to object to any of these statements forfeited the claim on appeal.[3] Wagstaff acknowledges trial counsel failed to object, but he argues counsel did not forfeit the claim because counsel raised the RJA at other points during the proceedings—e.g., in jury selection, and in counsel's presentencing *Romero* motion.[4] The Attorney General acknowledges the failure to object but he expressly declines to assert forfeiture with respect to the trial court's use of the phrase "strong young buck." The Attorney General contends Wagstaff has forfeited all other claims raised under the RJA by failing to object to them below.

Wagstaff urges us to exercise our discretion to consider the merits of the claim. He argues his trial counsel may have believed an objection would have been futile

---

[3] In referring to counsel's "failure to object," we include the failure to file a motion in the trial court under section 745, former subdivision (b) alleging a violation of subdivision (a).

[4] Section II.A.3 below summarizes trial counsel's claims under the RJA during jury selection. Counsel's assertion of the RJA as part of the *Romero* motion challenged the imposition of a five-year enhancement for a prior serious felony conviction under section 745, subdivision (a)(4). That subdivision addresses racial disparities in the imposition of sentences.

because the trial court had repeatedly overruled her previous objections and "minimized and denied" her motions. Wagstaff asserts that trial counsel may have believed further objections risked offending the court and incurring a harsher sentence. Finally, Wagstaff argues we may consider the merits of his claim under section 1259 because the trial court's conduct affected his substantial rights.

For claims based on the trial record, section 745, subdivision (b) allows defendants to "raise a claim alleging a violation of subdivision (a) on direct appeal from the conviction or sentence." But this provision did not abrogate the longstanding doctrine of forfeiture. "[O]ur review of a section 745 claim, like any other appellate claim, is subject to the general appellate rules of preservation and forfeiture of claims that could have been but were not made in the trial court." (*People v. Lashon* (2024) 98 Cal.App.5th 804, 812.) (Accord, *People v. Quintero* (2024) 107 Cal.App.5th 1060; *People v. Corbi* (2024) 106 Cal.App.5th 25, 41; *People v. Singh* (2024) 103 Cal.App.5th 76, 114.)

Forfeiture doctrine is not absolute, and we do not automatically apply it to every instance of a failure to object below. Reviewing courts may excuse a party for failing to make a timely objection at trial if the objection would have been futile. (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1328.) In this case, however, the record does not support Wagstaff's characterization of the trial court's rulings. Wagstaff cites no statements or rulings by the trial court that suggest it would not have fairly considered the merits of an objection, or that it would have punished Wagstaff more harshly had trial counsel objected. Instead, Wagstaff quotes a statement the *prosecutor* made during the sentencing hearing, but that implies nothing about the trial court's treatment of defense counsel's objections. Wagstaff cites the trial court's denial of his *Romero* motion, but he makes no claim the court failed to fairly consider the motion or otherwise abused its discretion. Absent any support in the record, Wagstaff's claims about trial counsel's failure to object or the futility of doing so amount to speculation. "We will not presume

that sentencing courts respond to arguments and objections in an arbitrary and vindictive manner." (*People v. Welch* (1993) 5 Cal.4th 228, 237.)

"The requirement of a specific objection serves important purposes. But, to further these purposes, the requirement must be interpreted reasonably, not formalistically." (*People v. Partida* (2005) 37 Cal.4th 428, 434.) A timely objection serves to alert the court and parties to the nature of the claim and objecting counsel's reasons for it, such that opposing counsel can address it and the trial court can make a fully informed ruling on an adequately developed record. (See *id.* at p. 435.) It is particularly important that counsel object at the earliest opportunity when the issue concerns alleged bias or prejudice by the trial court. (See, e.g., *North American Title Co. v. Superior Court* (2024) 17 Cal.5th 155, 187 [construing section 170.3, subdivision (c)(1) requiring a party to act "at the earliest practicable opportunity after discovery of the facts constituting the ground for disqualification" to ensure prompt resolution of any asserted claims of personal bias or prejudice, such that the parties receive full scrutiny of the judge's fitness to preside over the matter].)

Furthermore, when a claim under the RJA concerns a trial court's conduct, requiring the claim to be raised below furthers one of the central motivations for the RJA's enactment: "It is important to recognize the value of bringing a Racial Justice Act claim in the trial court in the first instance." (*People v. Lawson* (2025) 108 Cal.App.5th 990, 1000.) "Asking a trial court to consider whether its proposed ruling reflects the court's own implicit biases, or could have the unintended consequence of playing to jurors' implicit biases, serves an important purpose in raising the court's consciousness of the biases the Racial Justice Act is intended to eliminate." (*Id.* at pp. 1000-1001.)

Although trial counsel raised the RJA with respect to other issues, at no point did counsel raise the RJA with respect to any statements made by the trial court at any point during the sentencing hearing. With respect to the claim at issue here, trial counsel's previous invocations of the RJA were insufficient to serve the foregoing purposes.

10

California courts of review generally have the authority to consider the merits of an unpreserved claim in the exercise of their discretion.  (*People v. Williams* (1998) 17 Cal.4th 148, 161, fn. 6.)  But we decline to do so here.

Critically, the absence of any record concerning the racial implications of the language used by the trial court hinders our ability to evaluate the claim properly under the standards set forth in the RJA.  Section 745(a) would require us to determine whether the court used racially discriminatory language "about the defendant's race" or otherwise exhibited bias or animus towards the defendant "because of the defendant's race."  (See, e.g., *People v. Stubblefield* (2024) 107 Cal.App.5th 896, 922-923 (*Stubblefield*) [prosecutor used racially discriminatory language "about the defendant's race" in violation of the RJA].)  In contrast to the prosecutor's statements in *Stubblefield*, the language here did not expressly reference the defendant's race.  To be clear, language may violate the RJA without expressly referencing race.  The definition of "racially discriminatory language" includes "language that, to an objective observer, explicitly or *implicitly* appeals to racial bias, including, but not limited to, racially charged or racially coded language, language that compares the defendant to an animal . . . ."  (§ 745, subd. (h)(4), italics added.)  But determining whether language "implicitly appeals to racial bias" and whether the speaker used the language "about the defendant's race" may require contextual evidence—e.g., facts about historical usages or common cultural understandings of the language.  (See, e.g., *People v. Howard* (2024) 104 Cal.App.5th 625, 654 [language that does not explicitly appeal to racial bias may require a defendant to provide additional context and facts to make a prima facie case under the RJA.])

Had Wagstaff made a motion under section 745 in the trial court, he could have made a record on these matters under former subdivision (c):  "If a motion is filed in the trial court and the defendant makes a prima facie showing of a violation of subdivision (a), the trial court shall hold a hearing.  [¶]  (1) At the hearing, evidence may be presented by either party, including, but not limited to, statistical evidence, aggregate

data, expert testimony, and the sworn testimony of witnesses." Instead, the record is silent on historical usages and cultural understandings of the challenged language.

On appeal, Wagstaff attempts to fill in these gaps with multiple citations to sources outside the record, but he makes no attempt to establish a foundation for judicial notice of these sources, and we perceive no valid basis to judicially notice them on our own motion. In *Stubblefield*, by contrast, we took care to establish a foundation for judicial notice of the social unrest following the death of George Floyd and the racially charged nature of the conflict. (*Stubblefield*, *supra*, 107 Cal.App.5th at pp. 914-915.) We concluded we could appropriately consider those events in evaluating the language in question because they were " 'universally known' " facts of " 'generalized knowledge.' " (*Id.* at p. 918.)

We are aware of racist historical usages and cultural meanings associated with the language challenged here. But under the definition of "racially discriminatory language" set forth in section 745, subdivision (h)(4), the question is not whether we as members of the Court subjectively believe the language to be racist; the question is whether it constitutes "language that, to an objective observer, explicitly or implicitly appeals to racial bias . . . ." "The statute's inclusion of the word 'appeals' necessarily requires the 'objective observer' to consider the potential effect of the language on a person hearing it—i.e., whether the language appeals to a person's racial bias." (*Stubblefield*, *supra*, 107 Cal.App.5th at p. 917.) Absent a record with sufficient facts and evidence, we have no way to apply that standard while respecting the boundaries of our purview as a court of review.

For all these reasons, we conclude Wagstaff has forfeited this claim. Because Wagstaff argues in the alternative that trial counsel's failure to object constituted

ineffective assistance of counsel, we address the claim under the standard of *Strickland*[5] and its progeny.

### c. Ineffective Assistance of Counsel

Wagstaff contends his trial counsel rendered ineffective assistance in only one instance: counsel's failure to object to the trial court's use of the phrase "strong young buck" at the sentencing hearing.

### i. Legal Principles

To establish ineffective assistance of counsel, the defendant bears the burden of showing trial counsel's performance was deficient—that it "fell below an objective standard of reasonableness" in light of prevailing professional norms.  (*Strickland*, *supra*, 466 U.S. at p. 688.)  Second, the defendant must show the asserted deficiency in counsel's performance resulted in prejudice, defined as "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  (*Id.* at p. 694.)

" 'Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. [Citations]" ' [Citations.]  '[W]e accord great deference to counsel's tactical decisions' [citation], and we have explained that 'courts should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight' [citation].  'Tactical errors are generally not deemed reversible, and counsel's decision making must be evaluated in the context of the available facts.'  [Citation.]  In the usual case, where counsel's trial tactics or strategic reasons for challenged decisions do not appear on the record, we will not find

---

[5] *Strickland v. Washington* (1984) 466 U.S. 668 (*Stickland*).

ineffective assistance of counsel on appeal unless there could be no conceivable reason for counsel's acts or omissions." (*People v. Weaver* (2001) 26 Cal.4th 876, 925-926.)

### ii. *Counsel Had a Rational Tactical Reason Not to Object*

Wagstaff contends his trial counsel's failure to object to the court's use of the phrase "strong young buck" constituted deficient performance. But the record does not explain why trial counsel did not object. "Under those circumstances, a reviewing court has no basis on which to determine whether counsel had a legitimate reason for making a particular decision, or whether counsel's actions or failure to take certain actions were objectively unreasonable. [Citation.]" (*People v. Mickel* (2016) 2 Cal.5th 181, 198.) We begin with the presumption that counsel's actions fall within the broad range of reasonableness, and we "afford 'great deference to counsel's tactical decisions.' [Citation.]" (*Ibid.*) To justify reversal, Wagstaff must present affirmative evidence that counsel had no rational tactical purpose for not objecting. (*Ibid.*)

Wagstaff does not address the possibility that his trial counsel may have had a rational tactical reason for declining to object. Given that the trial court used the challenged language just before pronouncing sentence, at least one rational explanation is apparent: Counsel may have anticipated that the court was likely to impose a comparatively lenient sentence, and counsel may have decided not to disturb the likelihood of favorable treatment by objecting. (See *People v. Acosta* (2018) 28 Cal.App.5th 701, 707 [defense counsel may make a tactical decision that it is not in his or her client's interest to object at sentencing, especially in cases involving potentially long prison sentences].) Indeed, although the trial court subsequently denied Wagstaff's *Romero* motion, the court struck the five-year term for the enhancement. The court then imposed a 16-month sentence—five years shorter than the probation report's recommended sentence of six years four months.

14

Wagstaff fails to present any affirmative evidence that counsel had no rational tactical purpose for not objecting to the challenged language. We conclude he has not met his burden to show his trial counsel rendered ineffective assistance.

### 3. Claimed Violations of the Racial Justice Act During Jury Selection

Wagstaff further contends the trial court violated the Racial Justice Act based on statements the court made during jury selection and a ruling the court made in response to the prosecution's exercise of a peremptory challenge to a Black prospective juror. The Attorney General argues that Wagstaff forfeited these claims by failing to object below, and that Wagstaff has failed to establish the merits of these claims.

### a. The Trial Court's Statement During Jury Selection

### i. Procedural Background

The first day of jury selection began with three panels of prospective jurors. On the second day of jury selection, the trial court swore in two additional panels. Out of the five panels, the court excused 89 prospective jurors on hardship grounds in the first two days of jury selection. The trial court collected approximately 135 questionnaires completed by the remaining prospective jurors.

At the end of the second day, Wagstaff's trial counsel moved to quash the venire and requested fresh panels. Counsel stated, "With the passage of AB 3070, which is the new Racial Justice Act, I did need to put some things on the record to preserve my client's record. We've had five panels of 45 individuals randomized from Santa Clara County. Only one of the members of the venire was Black. My client is Black. And there's 2.9 percent of the population in Santa Clara County is Black but was not represented in this venire -- outside of the one individual." Counsel asserted the prospective jury panels did not reflect a jury of Wagstaff's peers. Counsel moved to quash the venire and requested a new panel.

The prosecutor opposed the motion to quash the venire. The prosecutor pointed out that he personally was Black, and he questioned the accuracy of defense counsel's

15

assertion that only one prospective juror was Black, adding, "Sometimes it is difficult to make determinations as to individuals' ethnicities or backgrounds simply from casually looking at them."

The trial court denied defense counsel's motion. The court noted that the prospective jurors were drawn from a randomized list, and found, "[T]here's nothing to suggest that this particular randomized list was in any way or in any form deficient in ensuring that there is a cross-section representative of the community." The court then added, "In fact, just an observation on the Court's own part that *we were fortunate to have a higher number of Asian-Americans in this venire and much higher than I think is representative of their percentage in this community*. And we, I think, endeavor to try to get as much representation as we can, but . . . it doesn't always yield the sort of representative representation that we would ideally like to get. [¶] But I think it will survive any challenge on that basis." (Italics added.)

Defense counsel did not object to any portion of these statements.

### ii. Application of the Racial Justice Act to the Trial Court's Statement During Jury Selection

Wagstaff challenges the trial court's response to his motion to quash the venire, in which the court stated, "[W]e were *fortunate to have a higher number of Asian-Americans in this venire* and much higher than I think is representative of their percentage in this community." (Italics added.) Wagstaff argues the court's statement demonstrated a favorable bias toward Asian-Americans—a group to which he does not belong—and he contends this bias had "the potential of tainting responses and rulings during the trial."

The Attorney General argues this claim was forfeited on appeal by trial counsel's failure to object, and that the statement did not violate the RJA in any event. Wagstaff asserts the claim was not forfeited because his trial counsel cited the RJA at other points during the proceedings, including the motion to quash the venire.

16

We agree with the Attorney General that this claim was forfeited by the failure to object. Wagstaff's trial counsel initially cited the RJA in support of the motion to quash the jury, but Wagstaff's claim on appeal does not challenge the trial court's denial of that motion. Rather, his claim concerns the trial court's *statement* about the representation of Asian-Americans in the venire—a statement to which trial counsel did not object. Furthermore, Wagstaff does not contend his trial counsel rendered ineffective assistance by failing to object to the court's statement.

Regardless, we would conclude the trial court's statement did not violate the RJA. First, the statement did not constitute "racially discriminatory language about the defendant's race" under section 745, subdivision (a)(2) because the statement was about Asian-Americans, not Wagstaff's race. (See *Stubblefield*, *supra*, 107 Cal.App.5th at pp. 922-924 [the prepositional phrase "about the defendant's race" in section 745, subdivision (a)(2) implies a certain degree of focus on the defendant's race].)

A trial court may also violate the RJA if it "exhibit[s] bias or animus towards the defendant because of the defendant's race" even without the use of racially discriminatory language. (§ 745, subd. (a)(1).) Viewing the trial court's statement in context, the court did not exhibit bias or animus towards Wagstaff because of his race. Immediately following the reference to Asian-Americans, the court added, "[W]e, I think, endeavor to try to get as much representation as we can, but . . . it doesn't always yield the sort of representative representation that we would ideally like to get." In the context of defense counsel's challenge to the venire, the court's use of the word "fortunate" did not exhibit bias or animus towards Black persons or prospective jurors, or towards Wagstaff because he is Black; rather, it was a statement of support for diversity in venires. Furthermore, a positive statement about one racial or ethnic group does not necessarily imply bias or animus against someone from another racial or ethnic group.

17

### b. *The Trial Court's Ruling on the Prosecution's Peremptory Challenge of a Black Prospective Juror*
#### i. *Procedural Background*

In the trial court's voir dire, the court asked prospective jurors if they or anyone close to them had ever been the victim of a crime. Prospective Juror Doe responded that he had a younger cousin in Michigan who had been murdered the year before. Prospective Juror Doe stated that a suspect had been arrested and charged, and Prospective Juror Doe believed the case was still active because the victim's mother had recently tried to convince him to go to Michigan. The court asked Prospective Juror Doe if he was "particularly close" to the cousin, and Prospective Juror Doe responded that he was not "closer to him than anyone else in my family." In further voir dire by the court, Prospective Juror Doe responded that nothing about that case would prevent him from being fair and impartial in this case, and he stated that he would be able to follow the law as instructed by the court.

In the prosecutor's voir dire, he pointed out to Prospective Juror Doe that he had not signed the declaration on his questionnaire stating it was completed under penalty of perjury. The prosecutor asked Prospective Juror Doe whether that was an oversight or intentional, and Prospective Juror Doe responded that it was "[p]robably an oversight." The prosecutor then inquired about the murder of Prospective Juror Doe's cousin. Prospective Juror Doe stated it had happened at the end of the prior year, following the death of his grandmother and an overdose suffered by his aunt. When the prosecutor asked Prospective Juror Doe if he was "particularly close" to the cousin who was murdered, Prospective Juror Doe responded, "Like I said, not closer than with the rest of my family. Usually the people I'm the closest with, my wife gave birth to them. Everybody else is just kind of, you know, we have the same name. We go to family reunions, that kind of thing." The prosecutor asked Prospective Juror Doe why the cousin's mother had asked Prospective Juror Doe to go to Michigan, and Prospective Juror Doe responded that it was for the trial and the funeral. The prosecutor then asked,

"Is it fair to say that you made the decision to focus on your family and work here rather than go back --," and Prospective Juror Doe responded, "Oh, yeah. . . . I don't have those kind[s] of feelings. I don't want to sound like I'm not emotional, but . . . I haven't talked with them in a very long time, and for the first time you reach out to me you're asking me to come to a funeral and a court trial doesn't seem appropriate."

The prosecution subsequently exercised a peremptory challenge to remove Prospective Juror Doe. Wagstaff's trial counsel objected to the peremptory challenge under *Batson*/*Wheeler*[6], the Sixth and Fourteenth Amendments to the United States Constitution, the "new" Code of Civil Procedure,[7] and the Racial Justice Act. Counsel asserted the prospective juror was "the only black member of the jury, possibly the only one in the jury pool." Counsel argued that Wagstaff was "a young African-American male" and did not have a jury of his peers at that point.

The prosecutor responded that defense counsel had not shown that he (the prosecutor) had demonstrated bias against any specific recognizable group and that nothing in the record would show he manifested any bias. The prosecutor then stated, "I am an African-American man myself. The defendant is an African-American man. And I do not believe that just having [an] African-American man under the matter entitles the defendant to a jury including an African-American man." The prosecutor pointed out that Prospective Juror Doe had not signed his questionnaire under penalty of perjury and did not disclose the fact of his cousin's murder until the court's voir dire.

---

[6] *Batson v. Kentucky* (1986) 476 U.S. 79; *People v. Wheeler* (1978) 22 Cal.3d 258.

[7] In 2020, the Legislature enacted Assembly Bill No. 3070, adding Code of Civil Procedure section 231.7 effective January 1, 2021. (Stats. 2020, ch. 318, § 2.) That code section prohibits parties from using "a peremptory challenge to remove a prospective juror on the basis of the prospective juror's race, ethnicity, gender, gender identity, sexual orientation, national origin, or religious affiliation, or the perceived membership of the prospective juror in any of those groups." (Code Civ. Proc., § 231.7, subd. (a).)

The prosecutor then cited Prospective Juror Doe's responses to three questions on the questionnaire and statements he made during voir dire concerning the murder of his cousin. First, the prosecutor cited Prospective Juror Doe's response to the question, "Do you believe the state has responsibility to prosecute persons who cause violence in the home even though the alleged victim does not want to proceed?" The prosecutor quoted Prospective Juror Doe's response as, "[N]o," and, "Not a big fan of government overstepping unless there is proof."

Second, the prosecutor cited Prospective Juror Doe's response to the question, "In every criminal trial the burden of proof for the prosecution is proof beyond a reasonable doubt. If you have heard testimony regarding a defendant's alleged prior acts of domestic violence or prior conviction for domestic violence-related offense, would you still be able to follow the law and hold the prosecution to its burden of proof in this case?" The prosecutor quoted Prospective Juror Doe's response as, "Yes. There have been numerous accounts of law enforcement taking shortcuts to meet a quota."

Third, the prosecutor cited Prospective Juror Doe's response to the question, "Would hearing testimony about a defendant's past conviction for domestic violence-related offense or past alleged acts of domestic violence make it difficult for you to apply the presumption of innocence to the defendant in this case? Why or why not? Please explain your answer." The prosecutor quoted Prospective Juror Doe's response as, "No. It seems very circumstantial."

The prosecutor also pointed to statements Prospective Juror Doe made in response to questions about the murder of his cousin and the loss of other family members. The prosecutor explained he was looking for empathetic jurors, and that Prospective Juror Doe's description of his relationship to his family "struck me, not necessarily as unempathetic, but potentially not the type of empathetic juror that I would be looking for in this particular case." The prosecutor argued that evidence admitted under Evidence Code sections 1101 and 1109 was critical to the prosecution's case, and he explained,

20

"The ability of a potential juror to be able to be empathetic, recognize that perspective of one person may not reflect their own is critical to the presentation and the consideration of the evidence in this case."

Defense counsel argued Prospective Juror Doe's questionnaire responses about "government overstepping" and "law enforcement taking shortcuts" constituted presumptively invalid reasons for a peremptory challenge under Code of Civil Procedure Section 231.7, subdivision (e)(1) as expressions of distrust of law enforcement. Counsel also pointed out that the prosecution had failed to question Prospective Juror Doe about these responses, which is a circumstance the trial court may consider under subdivision (d)(3)(C)(i) of that code section in determining whether to sustain the objection. Counsel further argued that Prospective Juror Doe's statements concerning his family relationships and his oversight in failing to sign the questionnaire were insufficient reasons to justify the peremptory challenge.

The prosecutor responded that Code of Civil Procedure section 231.7 was not intended "to ensure that if a member of a recognizable class is within a member of the jury venire that they then subsequently have a higher entitlement to placement on the jury." The prosecutor pointed out that his other peremptory challenges had "cut across" racial, gender, socioeconomic, and national origin categories. The prosecutor stated, "There is no question that the bases of my excusal of [Prospective Juror Doe] are grounded in reasoned legal theory as a litigator who happens to be black. The fact that he happens to be black does not give him a greater entitlement to placement on the jury, just because the defendant is black. That is not the purpose of the law. It is not the basis of the law, and there is nothing in what counsel has outlined or pointed to in the record that supports any determination of discriminatory intent, purpose, or action in this case."

The trial court summarized its understanding of the prosecution's reasons for the peremptory challenge, and the court stated, "The People have articulated as their chief concern [Prospective Juror Doe's] lack of empathy relative to the other jurors who have

21

been victimized at some point." The court added that it had independently formed its own impression that Prospective Juror Doe may have been minimizing the closeness of his relationship to the murder victim as a psychological "defense mechanism." The court then stated, "But the bottom line is he did seem not as impacted, as emotionally affected by that rather traumatic event. And it may [well be] that he's not as close to his cousin, but I do think that the People's underlying reason of trying to choose or select jurors that are going to be empathetic to certain crimes is justified by the People's explanation." The court concluded that, under the totality of the circumstances, there was a "substantial likelihood that an objectively reasonable person would view that this decision was made for reasons other than race." Accordingly, the trial court overruled defense counsel's objection.

### ii. *Application of the Racial Justice Act to the Trial Court's Ruling on the Peremptory Challenge*

Wagstaff contends the trial court violated the RJA in overruling his objection to the prosecution's exercise of a peremptory challenge to remove a Black juror. Wagstaff points to the prosecutor's statements and argues the trial court implicitly adopted the prosecutor's statements in ruling on the objection. Specifically, Wagstaff argues the prosecutor used racially discriminatory language when he stated, "I do not believe that just having a African-American man under the matter entitles the defendant to a jury including an African-American man."[8] Wagstaff asserts that, by injecting the concept of

---

[8] In Wagstaff's second supplemental opening brief, filed after the Attorney General filed his respondent's brief, Wagstaff asserted for the first time that the prosecutor's statements violated the RJA. We do not treat this assertion as an independent claim on appeal; rather, we consider this assertion to be part of Wagstaff's argument that *the trial court* violated the RJA.

Under Code of Civil Procedure section 231.7, subdivision (d)(3)(A)(i), the trial court may consider whether "[t]he objecting party is a member of the same perceived cognizable group as the challenged juror" in determining whether to sustain the objection. Wagstaff does not raise a claim on appeal that the court erred by overruling his objection under that code section.

"entitlement" into the argument, the prosecutor's statement implied that Wagstaff was "less than" and somehow had to earn the right to have a jury that includes someone of his own race. Wagstaff contends the record shows the trial court implicitly adopted the prosecutor's biased viewpoint because the court ignored defense counsel's arguments under Code of Civil Procedure section 231.7 and instead ruled solely on a perceived lack of empathy as the prosecution's only justification for the peremptory challenge.

The Attorney General contends this claim was forfeited by trial counsel's failure to object. On the merits, the Attorney General argues that Wagstaff's claim ignores the context of the prosecutor's statements, and furthermore, that the trial court's ruling did not constitute an implicit adoption of those statements.

We agree with the Attorney General on the merits. First, Wagstaff does not point to any language used by the trial court as constituting racially discriminatory language. Second, nothing in the record supports Wagstaff's assertion that the trial court implicitly adopted the prosecution's statements merely by declining to address defense counsel's arguments under Code of Civil Procedure section 231.7. We conclude this claim is without merit.

### 4. *Violation of the Racial Justice Act Based on the Record as a Whole*

Wagstaff argues generally that, in determining whether the court violated the RJA, we may collectively consider as a whole all of the trial court's statements and conduct throughout the proceedings. Relying on *Young*, *supra*, 79 Cal.App.5th 138, Wagstaff argues that subdivisions (a)(1) through (a)(4) of section 745(a) do not define independent violations of the RJA, but rather that the subdivisions define different means of proving a violation of section 745(a) as a whole. Wagstaff never raised such a claim below, so it is forfeited on appeal. Regardless, this argument does not establish by a preponderance of the evidence that the trial court violated the RJA.

In *Young*, the defendant sought discovery to support his claim that racial profiling in a traffic stop led to his arrest for possession of Ecstasy for sale. (*Young*, *supra*,

23

79 Cal.App.5th at p. 143.) He filed a motion for discovery under section 745, subdivision (d), which provides in part that, upon a showing of good cause, "[a] defendant may file a motion requesting disclosure to the defense of all evidence relevant to a potential violation of subdivision (a) in the possession or control of the state." Young sought records relating to charging decisions in cases comparable to his, by which Young intended to show the district attorney had more frequently charged Black defendants with possession for sale than defendants of other races. (*Young*, at pp. 143-144.) The trial court denied the motion on the ground that Young's showing of good cause "appeared to rest on nothing more than his race." (*Id.* at p. 144.)

On writ review, the Attorney General argued Young had failed to show good cause for discovery because Young's race was the only "logical link" between a claim of racial profiling in violation of section 745, subdivision (a)(1) and a claim of racially biased charging decisions under subdivision (a)(3). (*Young*, *supra*, 79 Cal.App.5th at p. 144.) In a thoughtful decision, the Court of Appeal rejected this reasoning. In construing section 745, the Court observed, "The four numbered subparts within section 745, subdivision (a) do not describe independent 'violations' of the statute. Rather, they describe different means of proving that the state exercised its criminal sanctions power 'on the basis of race, ethnicity, or national origin' in violation of section 745, subdivision (a)." (*Id.* at p. 163.) From this, the Court reasoned, "[T]he evidence offered in support of a theory of violation under one part may be corroborative of the evidence supporting another theory of violation under a different part. In short, as we read them, subdivision (a)(1) and (3) are not isolated pathways to proving a violation, but in a given case—this one being an example—may work in tandem." (*Id.* at p. 164.)

We find *Young* well-considered, and we agree as a general matter that evidence of conduct falling under one of the four subdivisions in section 745(a) could corroborate evidence of a violation under a different subdivision. But this does not necessarily imply that a defendant may establish a violation of 745(a) by piecing together isolated instances

24

of conduct when no specific instance of conduct satisfies the criteria set forth by one of the four subparts. Nor did the *Young* Court set forth such a holding; the Court was construing section 745 in the context of determining the requirements for a showing of good cause to obtain discovery under subdivision (d), not whether the evidence had established a violation of subdivision (a).

Furthermore, after *Young* was decided, the Legislature amended section 745 to add subdivision (k). (Stats. 2022, ch. 739, § 2, eff. Jan. 1, 2023.) Subdivision (k) requires a prejudice analysis for certain petitions "based on a violation of paragraph (1) or (2) of subdivision (a)." (§ 745, subd. (k).) This language implies each of those two subdivisions *does* describe an independent violation of the statute.

Arguably, section 745, subdivision (a)(1) might allow a defendant to establish a violation based on separate instances of conduct considered together; nothing in the plain language of that subdivision expressly rules out this possibility. But forfeiture doctrine still applies to this claim on appeal, especially because, as noted above, Wagstaff's trial counsel did not object under the RJA to any of the specific instances of the trial court's conduct Wagstaff now challenges on appeal. We conclude this claim fails.

## B. Lack of Jury Instruction on Lesser Included Offense of Misdemeanor False Imprisonment

The jury found Wagstaff guilty of felony false imprisonment as charged in count 1. The trial court did not instruct the jury on misdemeanor false imprisonment, and Wagstaff did not request the instruction. He contends the trial court erred by failing to instruct the jury sua sponte on misdemeanor false imprisonment as a lesser included offense. The Attorney General argues there was no substantial evidence to support an instruction on misdemeanor false imprisonment, and that even assuming the instruction was warranted, any error was harmless.

25

### 1. *Legal Principles*

"False imprisonment is the unlawful violation of the personal liberty of another." (§ 236.) "In this context, ' "[p]ersonal liberty" ' is violated when 'the victim is "compelled to remain where [they do] not wish to remain, or to go where [they do] not wish to go." ' [Citations.]" (*People v. Reed* (2000) 78 Cal.App.4th 274, 280.)

"If the false imprisonment be effected by violence, menace, fraud, or deceit, it shall be punishable by imprisonment pursuant to subdivision (h) of Section 1170." (§ 237.) "Misdemeanor false imprisonment is a lesser and necessarily included offense of felony false imprisonment." (*People v. Matian* (1995) 35 Cal.App.4th 480, 487 (*Matian*).) Misdemeanor false imprisonment requires no force beyond that necessary to restrain the victim. "All that is necessary is that ' "the individual be restrained of his liberty without any sufficient complaint or authority therefor, and it may be accomplished by words or acts . . . which such individual fears to disregard." [Citations.]' [Citation.]" (*People v. Babich* (1993) 14 Cal.App.4th 801, 806 (*Babich*).)

As used in section 237, "violence" means "using physical force greater than the force reasonably necessary to restrain someone." (*People v. Whitmore* (2022) 80 Cal.App.5th 116, 130 (*Whitmore*).) "Force is an element of both felony and misdemeanor false imprisonment. Misdemeanor false imprisonment becomes a felony only where the force used is greater than that reasonably necessary to effect the restraint. In such circumstances the force is defined as 'violence' with the false imprisonment effected by such violence a felony." (*People v. Hendrix* (1992) 8 Cal.App.4th 1458, 1462.) " 'Menace' is a threat of harm express or implied by words or act; an express threat or use of a deadly weapon is not required. [Citation.]" (*Whitmore*, at p. 130.)

"The trial court must instruct on general legal principles closely related to the case. This duty extends to necessarily included offenses when the evidence raises a question as to whether all the elements of the charged offense are present. . . . [¶] Nevertheless, 'the existence of "any evidence, no matter how weak" will not justify instructions on a lesser

included offense. . . .' [Citation.] Such instructions are required only where there is 'substantial evidence' from which a rational jury could conclude that the defendant committed the lesser offense, and that he is not guilty of the greater offense." (*People v. DePriest* (2007) 42 Cal.4th 1, 50 (*DePriest*).) In this context, "substantial evidence" means "evidence sufficient to 'deserve consideration by the jury,' that is, evidence that a reasonable jury could find persuasive." (*People v. Barton* (1995) 12 Cal.4th 186, 201, fn. 8.)

We independently review the question whether the trial court failed to instruct on a lesser included offense. (*People v. Avila* (2009) 46 Cal.4th 680, 705.) Error in failing sua sponte to instruct on a lesser included offense must be reviewed for prejudice exclusively under *People v. Watson* (1956) 46 Cal.2d 818, 836. (*People v. Beltran* (2013) 56 Cal.4th 935, 955 (*Beltran*).) Under that standard, the defendant must show it is reasonably probable a more favorable result would have been obtained absent the error. (*Ibid.*)

### 2. *No Substantial Evidence Supported an Instruction on Misdemeanor False Imprisonment*

The prosecution presented abundant evidence to support a finding Wagstaff used force or menace to restrain Doe's liberty. In her statements on the day of the incident, Doe said multiple times that Wagstaff repeatedly struck her in the face, threatened her with violence, and tried to close or hold the car door shut during the incident. She told the 911 dispatcher that he threatened to hit her more if she opened the door, and she told the police he said he would "give her something to scream about." She complained of pain and her face showed swelling afterwards. The statements she gave on the day of the incident were consistent with those of three percipient witnesses who saw it. Although none of the witnesses saw Wagstaff hitting Doe, one witness saw him holding on to her, and another witness heard Wagstaff screaming at her to shut the door.

27

Wagstaff argues the evidence supported an instruction on misdemeanor false imprisonment because the jury could have doubted the credibility of Doe's initial statements based on her subsequent recantation and the percipient witnesses' "limited observations." In her preliminary hearing testimony recanting her initial statements to the police, Doe asserted she opened the car door and threatened to jump out because she wanted to get a reaction from Wagstaff. She denied he hit her, and she claimed he stopped the car to let her out without preventing her from leaving the car.

An instruction on a lesser included offense is required only if there is " 'substantial evidence' from which a rational jury could conclude that *the defendant committed the lesser offense*, and that he is not guilty of the greater offense." (*DePriest*, *supra*, 42 Cal.4th at p. 50, italics added.) Doe said nothing in her preliminary hearing testimony that would support a finding that Wagstaff violated her personal liberty in any fashion. Her testimony therefore did not provide substantial evidence from which a rational jury could conclude Wagstaff committed misdemeanor false imprisonment.

Wagstaff argues Doe "could have altered any number of the 'facts' " when she recanted her initial statements to the police. He argues it was the jury's province to decide what version was credible. But Wagstaff does not point to any version of Doe's testimony or statements that would support a rational finding that he violated Doe's personal liberty without using violence or menace. Such a scenario amounts to "sheer speculation," *People v. Lewis* (1990) 50 Cal.3d 262, 277, not substantial evidence to support an instruction on misdemeanor false imprisonment.

Wagstaff relies on *Babich*, *supra*, 14 Cal.App.4th 801. In *Babich*, the Court of Appeal held the trial court erred by failing to instruct the jury on misdemeanor false imprisonment. (*Id.* at pp. 807-809.) At trial, the victim testified that Babich had held a knife to her throat, covered her mouth, and threatened to kill her while using his arms to hold her in his room. (*Id.* at pp. 804-805.) The victim testified that when two relatives entered the room, Babich hid the knife but continued to hold her with his arms. (*Id.* at

p. 805.) Babich denied using a knife, and the two relatives testified that they saw Babich hold the victim with his arms. (*Ibid.*) One of the relatives testified that she never saw a knife, and no knife was found in a police search of the room. (*Ibid.*) The Court of Appeal concluded that "ample evidence" supported an instruction on misdemeanor false imprisonment because the jury could reasonably have found the testimony of Babich and the relatives credible while disbelieving the victim's version of the incident. (*Id.* at pp. 807-808.)

*Babich* is distinguishable. In *Babich*, multiple witnesses testified to a version of the incident that could have supported a finding of misdemeanor false imprisonment if the jury credited their testimony instead of the victim's testimony. Here, the victim's version of the incident could only support either felony false imprisonment—if the jury credited her initial statements to police—or no false imprisonment at all, if the jury credited her testimony at the preliminary hearing.

Hypothetically, the jury could have credited several bits of evidence in isolation— e.g., Alvarez's statement that Wagstaff was holding on to Doe, Fowler's statement that Wagstaff was yelling at her to shut the door, and Doe's initial statement that Wagstaff tried to prevent her from getting out of the car—while disregarding the rest of Doe's statements altogether. But the Attorney General persuasively argues that this would not constitute substantial evidence from which a rational jury could find misdemeanor false imprisonment. Even assuming it would, on this record it is highly improbable the jury would have made those findings in such surgical fashion. Any error was therefore harmless because Wagstaff has not shown it is reasonably probable a more favorable result would have been obtained had the trial court given the instruction. (See *Beltran*, *supra*, 56 Cal.4th at p. 955 [stating the standard for prejudice].)

Accordingly, we conclude this claim is without merit.

### III.    DISPOSITION

The judgment is affirmed.

_____

                                                 Greenwood, P. J.

WE CONCUR:

_____

 Grover, J.

_____

 Danner, J.

People v. Wagstaff
H050597

Trial Court:                          Santa Clara County
Superior Court
Superior Court No.:                   C1919118

Trial Judge:                          The Honorable Jesus
Valencia, Jr.


Attorney for Appellant:               Nancy Susan Brandt
BRANDON DUANE WAGSTAFF:               under appointment by the
Court of                                              Appeal
for Appellant


Attorneys for Respondent              Rob Bonta,
THE PEOPLE:                           Attorney General of
California

                                      Lance E. Winters,
                                      Chief Assistant Attorney
General

                                      Jeffrey M. Laurence,
                                      Senior Assistant Attorney
General

                                      Bridget Billeter,
                                      Supervising Deputy
Attorney General

                                      Claudia H. Phillips
                                      Deputy Attorney General




People v. Wagstaff
H050597

Court of Appeal, Sixth Appellate District - No. H050597

**S292031**

# IN THE SUPREME COURT OF CALIFORNIA

## En Banc

_____

THE PEOPLE, Plaintiff and Respondent,

v.

BRANDON DUANE WAGSTAFF, Defendant and Appellant.

_____

The petition for review is denied.

The requests for an order directing depublication of the opinion are denied.

Liu and Evans, JJ., are of the opinion the petition should be granted.

(See Dissenting Statement by Evans, J.)

_____/s/_____
*Chief Justice*

PEOPLE v. WAGSTAFF

S292031

Dissenting Statement by Justice Evans

In 2022, Brandon Duane Wagstaff was convicted of false imprisonment by violence, violating a protective order, making criminal threats, and domestic violence battery.[1] The trial court held a sentencing hearing on November 4, 2022, during which the court also considered Wagstaff's motion to dismiss his prior strike conviction and motion to reduce the criminal threats conviction to a misdemeanor. After the People and defense counsel submitted on their respective arguments, the trial court addressed Wagstaff directly. The court stated:

> "You are a young man, but you're not a boy, you're not an adolescent. This motion and this idea about adolescent child behavior has merit, but I don't know that it has application in your case. [¶] People are influenced by many things. There are a lot of young men of color, there are African-American men, there are Asian men, there are Hispanic men, there are White kids and children who are tremendously and disproportionately impacted by poverty, by drugs, by violence, by other things in life that they have no control over, and you're no different; but a lot of those kids stand up, buckle down, and meet these challenges without resorting to crime. [¶] . . . [¶]

---

[1] Wagstaff was also charged with attempted second degree robbery; the jury found him not guilty on that count.

1

But the question is, 'Do you want to do the right thing?' You know, you have to become a man. And I don't mean to disrespect you, but you have to make manly decisions, hard decisions to take control of your life. [¶] You know, it's easy to bust into people's homes and take property because they're not there or because you're a strong young buck and you can do these things at-will. That's weak. There's nothing manly, there's nothing right about that, and your mom will tell you that."

Wagstaff's counsel did not object to these specific comments during the hearing. The court denied Wagstaff's motions and sentenced him to 16 months.

Wagstaff appealed, arguing among other things that the foregoing statements — in particular, the court's characterization of Wagstaff as a "strong young buck" — violated the California Racial Justice Act of 2020 (RJA; Stats. 2020, ch. 317). The Attorney General conceded this language violated the RJA, expressly declined to argue that Wagstaff forfeited the argument "based on defense counsel's reference to 'racial justice factors' that play into sentencing, and the clear violation of [Penal Code] section 745[,]" and supported remanding the matter for resentencing before a different judge. The Court of Appeal declined to accept the Attorney General's concession and instead concluded that Wagstaff's counsel's failure to object to the trial court's statements forfeited the claim on appeal.[2] Because I do not believe this is an appropriate case

_____

[2] After Wagstaff's sentencing, the Legislature amended the RJA to require trial court judges to disqualify themselves if the conduct alleged to violate the RJA involves judicial conduct or

2

to apply the forfeiture doctrine, especially in light of the importance of the RJA, I would grant review.

The Legislature enacted the RJA "to eliminate racial bias from California's criminal justice system." (Stats. 2020, ch. 317, § 2(i).) In so doing, it declared that "[d]iscrimination in our criminal justice system based on race, ethnicity, or national origin . . . has a deleterious effect not only on individual criminal defendants but on our system of justice as a whole. . . . Discrimination undermines public confidence in the fairness of the state's system of justice and deprives Californians of equal justice under law." (Assem. Bill No. 2542 (2019–2020 Reg. Sess.), § 2, subd. (a) (hereafter Assembly Bill No. 2542).) The Legislature thus pronounced that "racism in any form or amount, at any stage of a criminal trial, is intolerable, inimical to a fair criminal justice system, is a miscarriage of justice under Article VI of the California Constitution, and violates the laws and Constitution of the State of California." (*Id.*, subd. (i).)

As relevant here, an RJA violation includes circumstances in which "the judge . . . used racially discriminatory language about the defendant's race, ethnicity, or national origin, or otherwise exhibited bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin, whether or not purposeful." (Pen. Code, § 745, subd. (a)(2).) " 'Racially discriminatory language' means language that, to an

---

statements. (See Pen. Code, § 745, subd. (b), eff. Jan. 1, 2023.) Wherever possible, lower courts, however, can and should address issues of judicial racial bias in pre-2023 cases on the merits, consistent with the Legislature's intent as expressed in Assembly Bill No. 256.

3

objective observer, explicitly or implicitly appeals to racial bias, including, but not limited to, racially charged or racially coded language, language that compares the defendant to an animal, or language that references the defendant's physical appearance, culture, ethnicity, or national origin." (Pen. Code, § 745, subd. (h)(4).) The RJA prohibits both explicit and implicit bias. (*Id.*, subd. (a)(1) & (2).) "Implicit bias, although often unintentional and unconscious, may inject racism and unfairness into proceedings similar to intentional bias." (Assembly Bill No. 2542, § 2, subd. (i).) When an RJA violation occurs, "the court *shall* impose a remedy specific to the violation. . . ." (Pen. Code, § 745, subd. (e), italics added.)

Generally, a defendant who fails to object to an alleged error at trial forfeits the claim on appeal. (*In re Sheena K.* (2007) 40 Cal.4th 875, 880.) "However, neither forfeiture nor application of the forfeiture rule is automatic." (*People v. McCullough* (2013) 56 Cal.4th 589, 593.) An "exception to the forfeiture rule applies to 'matters involving the public interest or the due administration of justice.' " (*FCM Investments, LLC v. Grove Pham, LLC* (2023) 96 Cal.App.5th 545, 554 (*FCM*), citing 9 Witkin, Cal. Procedure (6th ed. 2021) Appeal, § 427, p. 463 [claim of arbitrator's linguistic or national-origin bias based on respondent's use of interpreter not subject to forfeiture rule]; see also *Catchpole v. Brannon* (1995) 36 Cal.App.4th 237, 244 (*Catchpole*), disapproved on other grounds in *People v. Freeman* (2010) 47 Cal.4th 993, 1006, fn. 4 [claim of judicial gender bias not forfeited].) Alleged judicial racial bias "obviously involves *both* a public interest *and* the due administration of justice" (*Catchpole*, at p. 244) since "[a]ll litigants are entitled to impartial adjudication free from arbitrary considerations of

race, gender, or national origin." (*FCM*, at p. 554.) Addressing Wagstaff's claim on the merits furthers these important interests as well as the RJA's purpose of eliminating racial bias from the state's criminal justice system.

In addition, "[r]eviewing courts have traditionally excused parties for failing to raise an issue at trial where an objection would have been futile." (*People v. Welch* (1993) 5 Cal.4th 228, 237; see also *People v. Sturm* (2006) 37 Cal.4th 1218, 1237 [defendant's failure to object to claims of judicial misconduct "does not preclude review 'when an objection and an admonition could not cure the prejudice caused by' such misconduct, or when objecting would be futile" or counterproductive].) As one court observed, "[f]ew more daunting responsibilities could be imposed on counsel than the duty to confront a judge with his or her alleged . . . bias in presiding at trial. The risk of offending the court and the doubt whether the problem could be cured by objection might discourage the assertion of even meritorious claims. Requiring the issue to be raised at trial would therefore have the unjust effect of insulating judges from accountability for bias." (*Catchpole, supra,* 36 Cal.App.4th at p. 244.) For all these reasons, I would not find Wagstaff's RJA claim forfeited.

The Court of Appeal, however, found the RJA claims forfeited and declined to exercise its discretion to consider the merits of the claims. The court acknowledged that it was "aware of racist historical usages and cultural meanings associated with the language challenged here[,]" but found the record lacked sufficient information to allow it to evaluate Wagstaff's RJA claim. (*People v. Wagstaff* (2025) 111 Cal.App.5th 1207, 1222.) In my view, the record, considered in context, is sufficient

to infer that the trial court exhibited implicit racial bias in violation of the RJA.

As the Court of Appeal recognized, the term "young buck" is deeply racialized. With origins in slavery, the phrase evokes negative stereotypes including associations with heightened criminality and violence, and implies that Black men are innately capable of committing crimes. The term and its troubling connotations are well known. (See Silva, *The Trap Chronicles, Vol. 3: Felons & Firearms* (2025) 84 Md. L.Rev. 309, 335–336 [" 'strapping young buck' " is "an undeserving, able-bodied African American who was taking advantage of the system"]; see also Lawson, *Police Shootings of Black Men and Implicit Racial Bias: Can't We All Just Get Along* (2015) 37 U. Hawaii L.Rev. 339, 352–353 ["Shortly after the Emancipation Proclamation, newspapers and books continued to traffic propaganda that portrayed Black males as brutes and animals. . . . The stereotypical image of the brutish, animalistic Black buck, with a craving for raping White women, made its Hollywood debut in the 1915 D.W. Griffith film, 'The Birth of a Nation' "; see also Nunn, *Rights Held Hostage: Race, Ideology and the Peremptory Challenge* (1993) 28 Harv. C.R.-C.L. L.Rev. 63, 64–65 [discussing how the jury's acquittal of Los Angeles police officers who beat unarmed motorist Rodney King "transform[ed] Rodney King into a wild and ferocious Black 'buck' who, like his counterpart in Hollywood fantasy, could somehow threaten life, limb and property while lying prone and surrounded by more than two dozen" police officers][3].)

---

[3] That the trial court did not explicitly refer to Wagstaff's race when making the comment is of no moment; racially coded language is just as much a violation of the RJA and harmful to

The trial court referred to Wagstaff as a "strong young buck" in the context of discussing the underlying offense. Indeed, the court described Wagstaff as able to commit the offense "at-will." The court also contrasted Wagstaff to young men and boys of other races who do not resort to crime. The court's "strong young buck" reference and its comparison of Wagstaff to individuals of other races had no relevance to sentencing. As the Legislature explained, "[b]ecause animal imagery is historically associated with racism, use of animal imagery in reference to a defendant is racially discriminatory and should not be permitted in our court system." (Stats. 2020, ch. 317, § 2, subd. (e); see also Prasad, *Implicit Racial Biases in Prosecutorial Summations: Proposing an Integrated Response* (2018) 86 Fordham L.Rev. 3091, 3105 ["Animal imagery can both depend on and perpetuate the negative effects of implicit racial biases"].)

In my view, the trial court's characterization of Wagstaff as a "strong young buck" in this context is sufficient on the face of the record to find racial discrimination warranting remand for resentencing before a different trial judge as supported by the Attorney General. (Pen. Code, § 745, subds. (h)(4), (e)(2).) To the extent the Court of Appeal believed further information was required to ascertain the historical or cultural context of the

---

the fair administration of justice as explicit appeals to racial bias. (Pen. Code, § 745, subds. (a)(2), (h)(4); see also Silva, *supra*, 84 Md. L.Rev. at pp. 335–336 ["Racial coding occurs when race neutral phrases are used to indirectly signify a racial theme or invoke racial resentment. . . . America has a long history and tradition of racial coding"]; *id.* at p. 335, fn. 201 [noting examples of racially coded language include " 'strapping young buck' "].)

challenged language, a remand for further factual development would have been the appropriate course of action.[4] (See *People v. Hardin* (2024) 15 Cal.5th 834, 892–893 (dis. opn. of Liu, J.).)

Concluding that Wagstaff's RJA claim is forfeited undermines the RJA's purpose and intent. The Legislature made "abundantly clear" that its "primary motivation for the legislation was the failure of the judicial system to afford meaningful relief to victims of unintentional but *implicit* bias" and "to remedy the harm to the defendant's case and to the integrity of the judicial system" that such bias causes. (*Bonds v. Superior Court* (2024) 99 Cal.App.5th 821, 828.) The trial court's use of "strong young buck" may not have been purposeful discrimination, but it was nonetheless racially fraught language comparing Wagstaff to an animal. It appears to reflect at least the very type of implicit bias about which the Legislature was concerned (see Assembly Bill No. 2542, § 2, subd. (e)) that "inject[s] racism and unfairness into proceedings similar to intentional bias" (*id.*, subd. (i)). "Avoiding such demeaning language and rejecting the pernicious stereotype it expresses are essential to sustaining public confidence in our system of justice." (*People v. Alvarez* (2025) 18 Cal.5th 387, 489 (conc. opn. of Liu, J.).) "[T]he RJA was designed to uproot" such bias, "to ensure racial discrimination — in all its forms — is eradicated from our criminal justice system." (*People v. Coleman* (2024) 98 Cal.App.5th 709, 725c–725d (conc. opn. of Evans, J.).)

---

[4] Both Wagstaff's counsel and the Attorney General advocated for a remand for further factual development at oral argument.

**EVANS, J.**

**I Concur:**

**LIU, J.**